# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-2257V

|  |  |
|---|---|
| JOSE RUIZ, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Filed: February 21, 2025 |
| Respondent. | |

*Jessia A. Olins, Mctlaw, Seattle, WA,* for Petitioner.

*Parisa Tabassian, U.S. Department of Justice, Washington, DC,* for Respondent.

## RULING ON ENTITLEMENT[1]

On December 3, 2021, Jose Ruiz filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of an influenza ("flu") vaccine administered on September 17, 2019, he suffered from Guillain-Barré syndrome ("GBS"), a Vaccine Injury Table (the "Table") claim. Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this ruling and decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means this Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, I find that Petitioner has carried his burden of proof in establishing that he suffered a Table GBS injury, and therefore is entitled to compensation.

## I.    Relevant Procedural History

This claim was initiated on December 3, 2021, and activated on April 14, 2022. Respondent filed a status report on August 2, 2022, indicating he was amenable to informal resolution of the case. (ECF No. 13). The parties discussed informal resolution for several months but were unable to reach an agreement. On May 2, 2023, Petitioner filed the instant Motion for Summary Judgment (ECF No. 27). Respondent filed his response to Petitioner's motion and Rule 4(c) report on May 22, 2023. (ECF No. 28). Petitioner filed his reply on May 30, 2023. (ECF No. 29). The matter is now ripe for disposition.

## II.    Relevant Medical History

### A.  Medical Records

Petitioner was born on October 16, 1975, and was 43 years old when he received a flu vaccine on September 17, 2019. Ex. 1 at 2. Approximately one month later, on October 16, 2019, Petitioner went to his primary care provider ("PCP") for an annual examination where he reported recent episodes of dizziness and tinging in his legs, as well as a rash on his fingers after performing some gardening. Ex. 4 at 27-30. Dr. Christina Deedas administered a tetanus-diphtheria-acellular pertussis vaccination and an allergy testing panel. *Id.*

On October 30, 2019, Petitioner returned to his PCP with complaints of migraine headaches, numbness in his feet for four days followed by numbness in his fingertips, and diminished taste. Ex. 4 at 59-62. A physical examination revealed normal strength, reflexes, facial symmetry, sensation, and gait. *Id.* Dr. Frances Tran's assessment was headaches and numbness and tingling of the skin and Petitioner was referred to neurology. *Id.* at 63, 73, 79.

Petitioner followed up with his PCP the next day, complaining of numbness in his feet and hands, imbalance, and a headache for four days. Ex. 4 at 87-92. He rated his pain as 9/10. *Id.* A cervical spine MRI showed multilevel degenerative changes, and Dr. Deedas' assessment was shortness of breath, numbness and tingling of the skin, and headaches possibly related to tooth pain. *Id.* at 91-92. Dr. Deedas administered a Toradol injection. *Id.*

Between November 1 and 7, 2019, Petitioner was admitted at Kaiser Foundation Hospital for progressive ascending numbness and tingling. Ex. 4 at 155, 438, 465. He was seen by the emergency department with complaints of facial numbness for two days and tingling and numbness in his fingers and toes for one week. *Id.* at 438. A physical examination revealed decreased crude touch to the middle forehead and bilateral lips, inability to smile, and inability to elevate his right eyebrow or to close both eyelids against resistance. *Id.* at 440. He also had diminished reflexes throughout and absent ankle reflexes. *Id.* at 484-85. A brain MRI was normal and CSF results showed mildly elevated protein for 52 (reference range 15-45) and a normal white blood cell count. *Id.* at 467, 486, 631.

During this hospitalization, an initial physical therapy ("PT") evaluation revealed mild impairments of balance, endurance, and sensation; some functional limitations with bed mobility, transfers, and gait; and normal strength throughout except 4/5 at the right hip and knee. Ex. 4 at 499-504. An initial occupational therapy ("OT") evaluation found no functional limitations. *Id.* at 495-98. An initial speech and language therapy evaluation revealed severely limited movement and seal of the lips, slightly weak but functional tongue movement, difficulty with transferring solids, and a recommended spoon-fed diet. *Id.* at 505-507. Petitioner was diagnosed with GBS and treated with five doses of IVIG during the course of his hospitalization. *Id.* at 465-66. Upon discharge, his symptoms had improved, he could walk with the use of a walker, and he was referred to outpatient PT, OT, and speech therapy.

On November 13, 2019, Petitioner had a follow-up appointment for his GBS with his PCP. Ex. 4 at 118-23. Dr. Deedas diagnosed Petitioner with tachycardia and numbness and tingling of the skin, and ordered a lumbar spine MRI, which revealed disc bulges from L1 to S1. *Id.* An OT evaluation on the same day noted no pain, independent walking without assistive devices, all range of motion within functional limits, strength ranging from 4/5 to 5/5, and impaired sensation in the bilateral fingers. *Id.* at 131-33. The OT determined that no further therapy was required. *Id.*

On November 25, 2019, Petitioner saw Dr. Latifa Boukarrou, a neurologist, for his GBS. Ex. 5 at 155-57. Petitioner reported that his symptoms slightly improved after IVIG, but he had continued facial weakness. *Id.* at 156. His physical examination was notable for bifacial diplegia. *Id.* Dr. Boukarrou's impression was Miller Fisher Syndrome ("MFS") variant of GBS and bilateral facial muscle weakness, and she ordered an EMG of the left extremities and recommended that Petitioner continue with his PT and ST. Petitioner's EMG was abnormal, revealing predominantly demyelinating ulnar neuropathy at the left elbow and peroneal neuropathy at the left fibular head, and Dr. Boukarrou opined that a

chronic demyelinating polyneuropathy could not be excluded based on the findings. *Id.* at 159-62.

Petitioner attended a PT session on November 30, 2019, where he reported lower extremity numbness. Ex. 4 at 182. However, the therapist was "unable to complete [the] evaluation due to orthostatic hypotension and lightheadedness," and no treatment was rendered due to petitioner feeling "symptomatic in standing only." *Id.* On January 23, 2020, Petitioner was discharged from PT due to failure to follow up as instructed. *Id.* at 179.

On December 13, 2019, Petitioner had a cardiology appointment for sinus tachycardia, and he reported receiving a flu vaccine and developing GBS approximately two to three weeks later. Ex. 4 at 227-30. The cardiologist's impression was autonomic neuropathy due to GBS. *Id.*

On January 13, 2020, Petitioner had a telemedicine follow-up neurology appointment with Dr. Boukarrou. Ex. 4 at 300. Her assessment was history of GBS and polyneuropathy, and she ordered an EMG of the face, which came back normal. *Id.* at 300, 319-20. Petitioner had another telemedicine follow-up with Dr. Boukarrou on March 18, 2020, and her assessment was history of GBS, right leg weakness, and right facial muscle weakness. *Id.* at 330-32. She ordered an EMG of the right extremities, which was abnormal, with findings suggestive of mild ulnar sensory neuropathy on the right but no evidence of a demyelinating polyneuropathy to suggest CIDP. *Id.*

On March 21, 2020, Petitioner had a neurological PT evaluation for lower extremity and facial weakness and impaired balance. Ex. 4 at 354-58. Petitioner reported persistent numbness and tingling in his toes, neck weakness, and an inability to blink or close his eyes, but he no longer required a walker for ambulating. *Id.* at 354-55. The therapist's assessment included decreased sensation, impaired balance, facial muscle weakness, and ankle and foot muscle weakness. *Id.* at 358.

On April 2, 2020, Petitioner participated in another neurological PT appointment and reported performing a daily home exercise program. Ex. 4 at 367. The therapist felt that Petitioner could progress on his own with strengthening exercises and was again discharged from PT on May 12, 2020, after again failing to show up – Petitioner attended three neurological PT sessions between November 2019 and April 2020. *Id.* at 366.

Petitioner had telemedicine follow-up appointments with Dr. Boukarrou on May 14 and July 8, 2020. Ex. 4 at 382-84, 425-27. Petitioner refused further lumbar punctures, EMGs, and IVIG. *Id.* Dr. Boukarrou noted that Petitioner had a history of GBS since

November 2019, that he received IVIG without a full recovery, that he had some continued facial diplegia, and that he was on disability until September 1, 2020. *Id.*

On May 15, 2020, Petitioner had an orthopedic hand surgy telemedicine appointment with Dr. Gabriel Trainer due to complains of ongoing weakness in his left-hand fingers. Ex. 4 at 389. Dr. Trainer's assessment was improving left-hand numbness and weakness in the setting of GBS and possible overlapping cubital tunnel syndrome, but was unsure if surgery would prove beneficial for Petitioner's condition. *Id.* at 390. Petitioner filed additional records for the subsequent time periods, but they are not relevant to the entitlement determination herein.

### B. Witness Evidence

Petitioner has submitted two sworn statements in support of his claim. The first is an affidavit executed on May 14, 2020, which simply indicates that he received the flu vaccine in the United States, that he sustained injuries which have lasted longer than six months, and that he had not previously collected an award or settlement of a civil action for damages relating to his claim. Ex. 6.

The second statement, a declaration executed on September 22, 2022, provides greater detail of his injury. Petitioner indicates that at the time of his vaccination, he was a Class B driver for a shredding company and his work entailed lots of physical activity including walking, lifting, and pulling and pushing bins. Ex. 10, ¶ 1. He goes on to say that following his diagnosis he was unable to participate in normal life for approximately 8-10 months and that he still does not like to participate in outings due to being unable to close his mouth. *Id.* ¶ 4. He rates his pain at 8/10 when he was hospitalized, with pain in his legs and hands and face, along with massive headaches, and reports feeling weak and dizzy at this time with an inability to close his eyes. *Id.* ¶ 5. While in inpatient rehab, he describes his pain as 7/10 and blacked out during the first day due to low blood pressure from his medication. *Id.* ¶ 6. He also rates his pain during outpatient rehab and home PT as 7/10. *Id.* ¶ 7. Regarding his current condition, Petitioner indicates that when he wakes up in the morning, he has a lot of body aches, he gets shortness of breath when bending over, and has to move slowly at work to avoid lightheadedness. *Id.* ¶ 11. He also states he doesn't want to go out in public because he has issues with speech and eating and drinking. *Id.* ¶ 16.

### III. **Parties' Respective Arguments**

Petitioner argues that the medical records and affidavits support his claim of a *prima facie* case for entitlement for an on-table GBS claim because he has satisfied all of

the criteria under the QAI for establishing GBS. Petitioner also requests damages in the total of $187,428.06, comprised of $180,000.00 in pain and suffering and $7,428.06 in past unreimbursed expenses. *See generally* Pet.'s Mot.

Respondent argues that Petitioner has failed to make a showing of Table GBS because his medical records do not establish that he had bilateral flaccid limb weakness, with weakness instead focused in his face and with prevailing symptoms in his extremities as numbness and tingling. Resp. at 9.

IV.     **Applicable Law**

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did

not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## V.    Analysis

### I.    Fact Findings – Onset and Entitlement

To establish a GBS Table injury following a flu vaccination, a petitioner must demonstrate by preponderant evidence that the onset of his GBS occurred at least three days but no more than forty-two days post vaccination. 42 C.F.R. § 100.3(a). The Table's Qualifications and Aids to Interpretation ("QAIs") define GBS as:

> [A]n acute monophasic peripheral neuropathy that encompasses a spectrum of four clinicopathological subtypes .... For each subtype of GBS, the interval between the first appearance of symptoms and the nadir of weakness is between 12 hours and 28 days. This is followed in all subtypes by a clinical plateau with stabilization at the nadir of symptoms,

or subsequent improvement without significant relapse. Death my occur without a clinical plateau.

42 C.F.R. § 100.3(c)(15)(i).

The Table identifies the four subtypes of GBS as acute inflammatory demyelinating polyneuropathy ("AIDP"), acute motor axonal neuropathy ("AMAN"), acute motor and sensory neuropathy ("AMSAN"), and Fisher Syndrome ("FS"). 42 C.F.R. § 100.3(c)(15)(ii)–(iii). It provides requirements for the diagnosis of the different subtypes of GBS – The diagnosis of AIDP, AMAN, and AMSAN requires:

(A) Bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs;
(B) A monophasic illness pattern;
(C) An interval between onset and nadir of weakness between 12 hours and 28 days;
(D) Subsequent clinical plateau (the clinical plateau leads to either stabilization at the nadir of symptoms, or subsequent improvement without significant relapse; however, death may occur without a clinical plateau); and,
(E) The absence of an identified more likely alternative diagnosis.

*Id.* at § 100.3(c)(15)(ii). Evidence of "electrophysiologic findings consistent with GBS or an elevation of cerebral spinal fluid (CSF) protein with a total CSF white blood cell count below 50 cells per microliter[ ]" is not required to establish a diagnosis of GBS consistent with the Table, but it is "supportive" evidence. 42 C.F.R. § 100.3(c)(15)(iv). The QAIs also specify that "[t]o qualify as any subtype of GBS, there must not be a more likely alternative diagnosis for the weakness." 42 C.F.R. § 100.3(c)(15)(v). The QAIs state that "[e]xclusionary criteria for the diagnosis of all subtypes of GBS include the ultimate diagnosis of any of" a list of conditions, which include hyperkalemia and hypokalemia. 42 C.F.R. § 100.3(c)(15)(vi).

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that he suffered an injury meeting the Table criteria, in which

---

[3] In summary, a petitioner must establish that they received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*

*Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### A. Factual Findings Regarding a Table GBS

After a review of the entire record, I find that a preponderance of the evidence supports the conclusion that Petitioner has satisfied the QAI requirements for Table GBS.

#### 1. Bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs

Petitioners seeking to establish a Table GBS must show they suffered bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs. Respondent's sole objection to Petitioner's claim is that the medical records do not establish that he had bilateral flaccid weakness and that "rather, any weakness was focused in his face, and the prevailing symptoms in his extremities were numbness and tingling." Resp. at 9. Respondent continues that although there were some extremity strength ratings which showed weakness (3+/5 to 4/5 in some physical examinations), it is unclear what Petitioner's baseline strength was prior to vaccination, or whether these ratings constitute a showing of weakness, noting that other neurological examinations during the same time period documented normal 5/5 motor strength throughout. *Id.* at 9-10 (citing Ex. 4 at 484, 487, 512, 530, and 533).

Although it appears that Petitioner's most serious symptoms, and the main source of his ongoing sequela-related frustration, is for facial weakness, the record also reflects that Petitioner suffered bilateral flaccid limb weakness. Petitioner reported feeling imbalanced on October 31, 2019, and the following day he sought medical attention for progressive numbness in his extremities, including decreased sensation in his toes and feelings of unsteadiness. Ex. 4 at 438, 480, 486. Then, on November 4, 2019, Petitioner had a neurology examination which indicated he was suffering from bilateral absent ankle reflexes, and had impaired bed mobility and gait due to decrease strength, balance, endurance, and he was noted as being at risk for falls due to impaired balance and reduced strength. Ex. 4 at 500. Petitioner also required the use of a walker upon discharge from the hospital.

Respondent argues against strength testing findings which showed reduce strength because this testing did not also provide an indication of baseline strength. But there is nothing in Petitioner's prior medical history which indicated any reduced-strength issues. In addition, as Respondent himself notes, during the same hospitalization period there were occasions where Petitioner's strength testing revealed normal (or 5/5) strength, allowing a contrast with reduced strength findings.

I also note that there is nothing in the QAI for a Table GBS injury which requires bilateral flaccid limb weakness to be the only, or even the most severe symptom. Although Petitioner's most severe symptoms (and certainly his most severe ongoing symptoms) admittedly involved facial weakness, including an inability to control his eyelids and mouth, there is sufficient evidence contained in the record to show that Petitioner suffered at least some bilateral flaccid limb weakness during the most serious part of his GBS affliction, even if it may have been of a more waxing/waning variety. Accordingly, I find that Petitioner has satisfied his burden in proving this QAI requirement.

## 2. Other QAI Requirements

Although Respondent has not offered any argument that Petitioner has failed to meet the other QAI requirements for Table GBS, they will be discussed briefly herein. The second requirement is for a monophasic illness pattern – a finding supported by the record. Petitioner first reported GBS symptoms approximately 29 days after vaccination on October 16, 2019, and those symptoms reached a nadir between November 1 and 7, 2019, when Petitioner required hospitalization and IVIG treatment. Ex. 4 at 27-30, 155, 438, 465. Thereafter, Petitioner's condition improved, and although he has not returned to pre-vaccination baseline health, his condition also has not relapsed.

The third QAI requirement an interval between onset and nadir of weakness between 12 hours and 28 days. As previously indicated, the onset of symptoms was on or about October 16, 2019, when Petitioner first complained of dizziness and tingling in his legs. Within 28 days, on November 1, 2019, Petitioner's condition because severe enough that he required hospitalization. This was the nadir of his symptoms, and it falls inside the defined period of time.

The fourth QAI requirement is a subsequent clinical plateau. There is no indication in the medical records that following the nadir of his symptoms and hospitalization, Petitioner suffered any sort of relapse. Although it is unclear whether some of Petitioner's facial symptoms will ever fully resolve, there is no evidence in the medical records, or from Petitioner himself, that his condition has done anything but slowly improve following his hospitalization.

The fifth and final QAI requirement is the absence of an identified more likely alternative diagnosis. There is nothing in the record to suggest that Petitioner's treating physicians diagnosed anything other than GBS as the source of Petitioner's symptoms. Although one record indicates that Dr. Boukarrou noted that a diagnosis of CIDP could not be ruled out, she also diagnosed Petitioner with GBS, as did his other treating physicians. Respondent also does not suggest that there is anything in the records to support any diagnoses other than GBS.

Therefore, based upon my review of the record as a whole, I find that Petitioner has carried his burden in proving the requirements for Table GBS.

### B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly on September 17, 2019. Ex. 2; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for his injury. Petition at 4; Section 11(c)(1)(E) (lack of prior civil award).

As stated above, I have found that the onset of Petitioner's GBS was within 3-42 days of vaccination. *See* c(c)(15)(ii)(A) (setting forth this requirement). This finding satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table.

Based upon all of the above, Petitioner has established that he suffered from Table GBS. Additionally, he has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

### Conclusion

**In view of the evidence of record, I find Petitioner is entitled to compensation. A damages order will be entered following the issuance of this ruling to direct the parties of the next steps in resolving damages.**

**IT IS SO ORDERED.**

**<u>s/Brian H. Corcoran</u>**
Brian H. Corcoran
Chief Special Master